IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANDREW DEAN,                          )
                                      )
                Plaintiff,            )
                                      )        Civil Action No. 09-515
        v.                            )
                                      )
SPECIALIZED SECURITY RESPONSE,        )
                                      )
                Defendant.            )

**<u>MEMORANDUM OPINION</u>**

CONTI, District Judge.

Andrew Dean ("Dean" or "plaintiff"), an African-American security guard, commenced

this action against his former employer, Specialized Security Response, Inc. ("Specialized" or

"defendant"), by filing a complaint with this court on April 28, 2009.  (ECF No. 1.) Plaintiff's

complaint includes the following claims: (1) race discrimination in violation of the Civil Rights

Act, 42 U.S.C. § 1981 ("§ 1981"); (2) retaliatory discharge in violation of the Fair Labor

Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"); and (3) a violation of Pennsylvania's

Criminal History Record Information Act, 18 PA. CONS. STAT. §§ 9101, *et seq.* ("RIA").

Pending before the court is a motion for summary judgment (ECF No. 30) filed by

defendant on February 11, 2011.  After considering defendant's motion, plaintiff's response

(ECF No. 33), the combined statement of material facts (("C.S.F.") (ECF No. 38)), and the

parties' other submissions, defendant's motion will be granted with respect to the § 1981 claim

and the claim for a violation of the RIA.  Defendant's motion will be denied with respect to the

remaining claim under the FLSA because after viewing all disputed facts in favor of plaintiff and

drawing all reasonable inferences in his favor, the court concludes plaintiff adduced sufficient evidence for a reasonable jury to render a verdict in his favor with respect to that claim.

*Factual Background*

**A. Specialized Security Response**

On January 1, 2008, Robert Arnoni ("Arnoni") partnered with Michael Orsini ("Orsini") to form Specialized. (C.S.F., Part I ¶ 4.) Specialized provides security guards to clients who wish to utilize security for their places of business or for a certain event. (Id. ¶ 3.) Defendant was funded with Arnoni's capital and Arnoni's initial role was solely as an investor. (Id. ¶ 5.) Orsini held the title of defendant's chief operating officer ("C.O.O.") and one of his responsibilities included signing all employee paychecks. (Id. ¶ 10.) Prior to working at defendant, Orsini worked for Victory Security ("Victory"). (Id. ¶ 6.) In or around December 2007, Orsini left Victory and, along with co-worker Donald Dixon ("Dixon"), commenced employment with defendant. (Id. ¶ 7.)

Dixon hired guards and other employees from Victory to work for defendant. (Id. ¶ 11.) Dixon held the title of director of operations and handled all day-to-day tasks such as obtaining clients, hiring employees, assigning employees to a particular work site, giving employees uniforms, and making schedules. (Id. ¶¶ 9, 19.) During the first quarter of 2008, Arnoni assumed an administrative role with the company and due to lack of business, began terminating employees that Dixon brought over from Victory. (Id. ¶¶ 12,15.) Dixon resigned from defendant's employ in or around June 2008. (Id. ¶ 17.) At some point later, after being asked to contribute money to defendant, Orsini declined, submitted a letter of resignation from Specialized, and started his own company. (Id. ¶ 18.)

**B. Specialized's private detective license**

In 2008, the time relevant to this action, defendant did not possess its own private detective license. (C.S.F., Part II ¶ 5.) Orsini, the C.O.O. of the company, however, did possess a license. (Id.) In August 2009, Orsini filed a petition seeking to transfer the existing license held in his name to defendant. (Id.) The petition to transfer the license from Orsini to defendant was denied. (Id.) Defendant applied for its own license as a private detective business on February 17, 2010, and that petition was approved. (Id. ¶ 7)

## C. Specialized's general hiring process

Once a prospective employee completed the necessary paperwork associated with an application for employment, as overseen by Dixon, the paperwork was sent to human resources. (C.S.F., Part I ¶¶ 20-21.) Human resources completed the criminal background check required for all new employees, in addition to handling wage assignments, collecting payroll information, and filing paperwork. (Id. ¶¶ 21-22.) Pam Hoston ("Hoston"), the payroll and human resources person during plaintiff's tenure, was one of the employees who transferred from Victory. (Id. ¶ 23.) Once Hoston received the state police's response to a criminal record background check, she reviewed and filed it. (Id. ¶ 24.) If there was a discrepancy with the results, Hoston informed Orsini or Dixon. (Id.)

## D. Hiring of plaintiff

Plaintiff began his employment with defendant on March 5, 2008. (Id. ¶ 29.) Immediately prior to commencing his employment with defendant, plaintiff was employed by Victory. (Id. ¶ 27.) While working for Victory, plaintiff was approached by Orsini and Dixon and offered a position with a new company - defendant - they were starting. (Id. ¶¶ 27-28.) Dixon and plaintiff knew each other from childhood and Dixon considered the two to be friends. (Id. ¶ 30.)

While at Victory, plaintiff was assigned to an account for All-Clad Metal Crafters ("All-Clad"), which was transferred to defendant by Orsini and Dixon. (Id. ¶¶ 31-32.) The guards who were assigned to the account were automatically hired by defendant for the purpose of continuing their work for that specific account. (Id. ¶ 32.) Because plaintiff was already working for the All-Clad account, it was a formality that he would be hired to work for defendant. (Id. ¶ 33.) Plaintiff did not have an interview and was hired on March 5, 2008, immediately after filling out the requisite application. (Id. ¶¶ 28, 34.)

**E. Plaintiff's criminal history**

Prior to commencing employment with defendant, plaintiff was convicted of a felony offense, in addition to multiple second-degree misdemeanors and other various crimes. (Id. ¶ 35.)[1] Plaintiff answered "no" on his employment application regarding whether he had ever been convicted of a crime. (Id. ¶ 36.) Plaintiff informed Dixon he was a convicted felon and Dixon told him to indicate on his employment application that he had never been convicted of a crime. (Id. ¶ 37.)[2] Orsini was present during this conversation, but plaintiff was unsure whether Orsini overheard the exchange. (Id. ¶ 38.) Dixon, however, disputes plaintiff's representation and stated that he never told plaintiff to misrepresent his criminal history on his application. (Id. ¶ 39.) Dixon did not recall plaintiff approaching him regarding whether his criminal history would be a problem in relation to his employment with defendant. (Id.)

Although Dixon admitted he knew plaintiff had a history of criminal activity, he did not know plaintiff's specific convictions or whether they were of the kind that would disqualify him from employment with defendant. (Id. ¶ 40.) Dixon testified that Orsini had the same knowledge as he did regarding plaintiff's criminal history. (Id. ¶ 41.) Dixon reviewed plaintiff's

---

[1] It is unclear from the record the type of felony or felonies for which plaintiff was previously convicted. (See Def.'s App. (ECF No. 31), Tab 8 at A91-94.)

[2] The record is unclear about when plaintiff informed Dixon that he was a convicted felon.

application for employment to ensure that it was complete, but did not recall whether he noticed that plaintiff had represented that he did not have a criminal record. (Id. ¶ 42.)

Plaintiff's criminal background check was requested on the date he was hired and the results were received on March 11, 2008. (Def's. App., Tab 8 at A91-94.) The results were sent directly to Hoston. (C.S.F., Part I ¶ 43.) A day or two after the results of the background check were received, Jim Davis ("Davis"), an office assistant for defendant,[3] informed plaintiff that the results revealed his felony record. (Id. ¶ 47.) Despite the felony convictions, Davis instructed plaintiff to report back to work. (Id. ¶ 48.) Davis never expressly represented to plaintiff that his criminal record would *not* be a problem. (Id.) Plaintiff continued to work for more than four months. (Id. ¶ 92.) He was terminated in late July or early August 2008. (Id.)

### F. Plaintiff's employment with Specialized

Plaintiff, in addition to working for the All-Clad account, worked for a period of several days at Mars Area High School ("Mars H.S.") to provide security for a graduation ceremony. (Id. ¶¶ 49, 50-51.) Specifically, plaintiff worked at Mars H.S. on May 29, 2008 and June 2-5, 2008. (Def.'s App., Tab 3 at A57-63.) While plaintiff worked at Mars H.S., he continued to work his regular shift at the All-Clad warehouse. (C.S.F., Part I ¶ 52.) Plaintiff worked from 3:00 p.m. to 11:00 p.m. at Mars H.S. and 12:00 a.m. to 8:00 a.m. at All-Clad. (Id. ¶ 53.) Dixon, who assigned plaintiff to work at Mars H.S., recognized that plaintiff might have trouble getting to All-Clad on time with only one hour between shifts, so Dixon accordingly adjusted the shift. (Id. ¶ 91.) Other than the several-day period when he worked at Mars H.S., plaintiff worked solely at the All-Clad warehouse location. (Id. ¶ 54.)

---

[3] The record is unclear regarding Davis' official title while working for defendant. (See Def.'s App., Tab 14 at A229.)

On June 19, 2008, Matt Brewer, the warehouse manager for All-Clad, sent an email to Dave Rodgers of defendant stating: "There is a guard on the night shift, I believe his name is Andrew Dean. He spends more time on his cell phone and sitting in his car reading the newspaper then [sic] he does paying attention to what is going on. I would prefer that he is not here at all." (Id. ¶ 49.) On June 20, 2008, defendant issued plaintiff a disciplinary action report, which stated in pertinent part: "I advised Andrew Dean that I had been notified by All-Clad Management . . . about his conduct . . . and they would prefer to have him removed. I warned him that this type of behavior has been ongoing and will not be tolerated. Any further incidents of this nature will be cause for termination." (Id. ¶ 58.)

**G. Employee sign-in registers**

Security guards employed by defendant were personally responsible for filling out a sign-in register documenting their hours worked. (Id. ¶ 60.) The sign-in registers were located at the worksite to which the guard was assigned. (Id. ¶ 61.) Each guard printed his or her name, the date, and the time the shift began and ended. (Id. ¶ 62.) The guard signed the register and listed the total number of hours worked each day. (Id.) The sign-in registers contained a payroll cover sheet, which summarized the total hours worked by a guard for a particular week in a given pay period. (Id. ¶ 63.) At the end of each week, site supervisor Larry Spangler ("Spangler") retrieved, signed, and submitted the payroll cover sheet and sign-in registers to human resources. (Id. ¶¶ 65-66.) Human resources tallied the payroll numbers and submitted them to the payroll company. (Id. ¶ 67.)

Each sign-in register consisted of vertical and horizontal lines where the security guards signed their names and inserted the hours worked. (C.S.F., Part II ¶ 27.) When a guard was running late or needed to stay late or leave early, the sign-in registers would either be changed at

the worksite or by payroll.  (C.S.F., Part I ¶ 90.) In order to make these corrections, it was common practice for defendant to white-out the sign-in registers to reflect the correct time worked by a guard.  (Id.)

## H. Plaintiff's overtime issue

Plaintiff alleges that he was not paid for eight hours of overtime that he worked for defendant, although he could not recall the specific pay period during which he was shorted or where he worked the specific overtime hours.  (Id. ¶¶ 68-69.) Plaintiff testified, however, that the week he was shorted was a week in which he worked and registered for a forty-eight hour work week.  (Id. ¶ 70.) The only forty-eight hour week that plaintiff worked and registered for was during the week of May 25, 2008 through May 31, 2008, during which plaintiff worked and registered forty hours at All-Clad and eight hours at Mars.  (Id. ¶ 71.)

The two-week period of May 25, 2008 through May 31, 2008 and June 1, 2008 through June 7, 2008, comprised a single pay-period for plaintiff.  (Id. ¶ 72.)  During the second week, he worked and registered sixty-nine hours, comprised of forty hours at All-Clad and twenty-nine hours at Mars.  (Id. ¶ 73.) According to the sign-in registers for All-Clad and Mars during the pay periods of May 25, 2008 through June 7, 2008, plaintiff registered a total of 117 hours and his pay stubs reflected he was paid for all those hours.  (Id. ¶¶ 74-75.) For the pay period beginning June 8, 2008 and ending on the last day plaintiff worked for defendant, plaintiff never registered for more than 40 hours in any week.  (Id. ¶ 76.) The last shift that plaintiff worked while employed for defendant was on July 23, 2008.  (Id. ¶ 77.)

In the event that an employee was paid an incorrect amount of money, he or she was to notify Hoston and she would review the sign-in registers to determine whether a mistake had been made.  (Id. ¶ 78.) If so, defendant would contact the payroll company and either a check

would issue immediately or the employee would be compensated during the next pay period. (Id. ¶ 79.) Plaintiff complained to Spangler and Beth Loris ("Loris"), an office employee, about the alleged unpaid overtime. (Id. ¶ 80.) Spangler informed plaintiff to call into the office; he did so and was told by Loris that there was no record of the alleged overtime, i.e., it did not appear on any of the sign-in registers. (Id. ¶¶ 80-81.) Plaintiff was never able to produce a record to show that he worked the overtime. (Id. ¶ 82.)[4] Plaintiff may not have been able to provide such a record, however, because the documentation of hours worked is collected at the worksite. (C.S.F., Part II ¶ 40.) Other than Spangler and Loris, the only other person plaintiff informed about his overtime issue was Rick DeMarco ("DeMarco"), a Caucasian co-worker. (C.S.F., Part I ¶ 83.)

DeMarco informed plaintiff that he complained about being shorted overtime pay. (Id. ¶ 84.) Plaintiff never witnessed DeMarco complaining and did not know who he complained to or when the complaint took place. (Id. ¶ 85.) Plaintiff did not know whether DeMarco had a criminal record or had ever been subject to disciplinary action with defendant. (Id. ¶ 86.) DeMarco eventually was paid the overtime he had requested. (Id. ¶ 87.)

The sign-in register for June 2, 2008 indicated that plaintiff worked from 5:30 p.m. to 11:00 p.m., which was less than a full shift. (C.S.F., Part II ¶ 28.) The sign-in register for that day had broken horizontal and vertical lines and the "Time in" and "Total" hours were whited-out and altered. (Id. ¶ 29.) Defendant asserts that the payroll cover sheet comported with the sign-in register and accurately reflected that plaintiff registered for 5.5 hours of work. (Id.) The sign-in register for June 3, 2008 indicates that plaintiff worked from 3:30 p.m. to 11:00 p.m., also

---

[4] The record reflects that plaintiff worked over 80 hours for the two-week pay period in question and that he was paid for the full 117 hours he worked. The court cannot decipher which overtime was recorded and not paid. The court declines to speculate about the merits of plaintiff's claims for overtime compensation; rather, plaintiff's overtime compensation issues are discussed for the limited purpose of resolving his claim for retaliatory discharge under the FLSA.

less than a full shift.  (C.S.F., Part I ¶ 92.) The sign-in register was altered, but the payroll cover sheet comported with the sign-in register and reflected that plaintiff registered for 7.5 hours of work.  (C.S.F., Part II ¶ 31.) Plaintiff acknowledged that the sign-in register for June 4, 2008 did not appear to be altered and indicated that he worked his full shift from 3:00 p.m. to 11:00 p.m. (Id. ¶¶ 32-33.) There was an arrow from plaintiff's name to the name of Chuck McKnight ("McKnight") on the applicable register, which indicated that plaintiff and McKnight switched shifts.  (Id. ¶ 33.) Plaintiff alleges that the whited-out records removed three hours of work for the pay period of May 25, 2008 through June 7, 2008.  (Id. ¶ 36.) Plaintiff asserts he is entitled to overtime compensation for these three hours.  (Id.)

## I. Plaintiff's termination

In late July or early August 2008, Orsini called plaintiff into his office.  (Id. ¶ 92.) Plaintiff believed that he was being summoned to discuss the overtime pay issue.  (C.S.F., Part II ¶ 42.)  At the meeting, however, Orsini informed plaintiff that he could no longer work for defendant as a security guard because his criminal record contained felony convictions.  (C.S.F., Part I ¶ 92.)[5] Orsini told plaintiff that he could have his job back if his criminal record was expunged.  (Id. ¶ 93.) Although plaintiff tried to expunge the felony convictions from his record, some of the offenses could not be expunged.  (Id. ¶ 95.) Plaintiff could not recall how much time elapsed between the time he made the complaint about the overtime pay and the time he was terminated.  (Id. ¶ 30.)

### *Standard of Review*

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.**  A party may move for summary judgment, identifying

---

[5] When plaintiff was terminated, Dixon was no longer working for defendant and had no personal knowledge regarding the reason for plaintiff's termination.  (C.S.F., Part I ¶ 46.)

each claim or defense - or the part of each claim or defense - on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

. . .

**(c) Procedures.**

**(1)** *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could

rationally find in favor of the non-moving party in light of his burden of proof.") (citing Anderson, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322-23).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

### *Discussion*

Plaintiff brought the following claims: (1) race discrimination in violation of § 1981 (count I); (2) retaliatory discharge in violation of the FLSA (count II); and (3) a violation of Pennsylvania's RIA (count III).

Defendant argues it is entitled to summary judgment with respect to all plaintiff's claims. With respect to the § 1981 claim, defendant argues that plaintiff failed to establish a prima facie claim for employment discrimination because plaintiff's felony record disqualified him from seeking employment as a security guard. (Def.'s Mem. (ECF No. 32) at 3.) Defendant maintains plaintiff did not suffer an adverse employment action and failed to produce sufficient evidence to

show a causal nexus between his failure to receive overtime, his termination, and his race. (Id. at 4-5.) With respect to the retaliatory discharge claim under the FLSA, defendant contends that plaintiff failed to establish a causal connection between his internal complaint and his termination. (Id. at 16-20.) With respect to counts I and II, defendant asserts that even if plaintiff sustains his prima facie case, defendant's decision to terminate plaintiff due to his felony record constituted a legitimate and nonretaliatory reason because it was mandated by the applicable licensing statute. (Id. at 8, 20.) With respect to plaintiff's RIA claim, defendant argues that a security guard's criminal history is relevant in that a felony prohibits the plaintiff from working as a security guard, and therefore may be considered with respect to suitability for employment. (Id. at 27-28.)

## I. Count I - § 1981 race discrimination claim

### A. Burden-shifting framework

Defendant alleges plaintiff's § 1981 claim should be dismissed because plaintiff failed to establish a prima facie claim for employment discrimination. Section 1981 provides, in pertinent part, that "all persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws and proceedings for the security of persons . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The Supreme Court recognized that it is often difficult for a plaintiff to prove that an employer acted with conscious intent to discriminate. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801 (1973). One manner in which a plaintiff can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but rather was a pretext for unlawful discrimination. Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 253 (1981). In cases where the plaintiff lacks direct evidence of discrimination, courts must apply the burden-shifting

framework set forth in McDonnell Douglas. See Barber v. CSX Distrib. Servs., 68 F.3d 694, 698 (3d Cir. 1995).[6]

A plaintiff must first establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 254. If a plaintiff successfully proves a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. Simpson, 142 F.3d at 644 n.5. The defendant may satisfy its burden by offering evidence of a nondiscriminatory reason for its action. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). Once the defendant offers a legitimate reason for the conduct in question, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reasons offered by the defendant were not its true reasons, but were pretext for discrimination. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999). The ultimate burden of persuasion remains with the plaintiff at all times. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993). This "scheme of proof" set forth in McDonnell Douglas applies to claims under § 1981 and the FLSA. Wildi v. Alle-Kiski Med. Ctr., 659 F. Supp. 2d 640, 664 (W.D. Pa. 2009) (citing Cononie v. Allegheny Gen. Hosp., 29 F. App'x 94, 95 (3d Cir. 2002)).

**B. Establishing a prima facie case**

To allege a successful race discrimination claim under § 1981, a prima facie case is established when a plaintiff shows the following four elements: (1) he is a member of the protected class, (2) he was qualified for the position, (3) he suffered an adverse employment decision, and (4) that an otherwise similarly situated person outside of the protected class

---

[6] Courts apply the tests used to evaluate employment discrimination claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.* to employment discrimination claims brought under § 1981 because the substantive elements of both claims are generally identical. Anderson v. Wachovia Mort. Corp., 621 F.3d 261, 267 (3d Cir. 2010) (citing Brown v. J. Kaz, Inc., 581 F.3d 175, 181-82 (3d Cir. 2009)).

received more favorable treatment. Riding v. Kaufmann's Dept. Store, 220 F. Supp. 2d 442, 449 (W.D. Pa. 2002); see Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 366 (3d Cir. 2008); Jones, 198 F.3d at 411.

Establishing the elements of a prima facie case often depends on the facts of the particular case in question and as such, a prima facie case cannot be established on a one-size-fits-all basis. Id. The plaintiff's prima facie case of discrimination is not intended to be onerous, rigidly applied or difficult to prove. Burdine, 450 U.S. at 253; see Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006). The prima facie case is only meant to allow a court to eliminate the obvious and lawful reasons that a defendant acted as they did with respect to the termination of plaintiff's employment. Pivirotto v. Innovative Sys., 191 F.3d 344, 352 (3d Cir. 1999).

Additionally, the evidence presented by a plaintiff in an employment discrimination case need not be considered only with respect to a single issue. In Doe, the Court of Appeals for the Third Circuit observed that "evidence supporting the prima facie case is often helpful in the pretext stage, and [that] nothing about the McDonnell Douglas formula requires [a court] to ration the evidence between one stage or the other." Doe, 527 F.3d at 370.

**C. Plaintiff's prima facie case**

Defendant concedes that plaintiff was an African-American male and, as a member of a protected class, satisfied the first element necessary for establishing a prima facie case of race discrimination under § 1981. (Def.'s Mem. at 4.)

To satisfy the second element, courts require a plaintiff to show that he was qualified for the position in question. Anderson v. Consol. Rail Corp., 297 F.3d 242, 249 (3d Cir. 2002). An inference of employment discrimination cannot be drawn where an employer commits an

adverse employment action against an individual who is unqualified for the desired position. Makky v. Chertoff, 541 F.3d 205, 215 (3d Cir. 2008). Defendant contends that a security company cannot employ a security guard with a felony on his record pursuant to state licensing requirements. (Def.'s Mem. at 4.)[7]

Under Pennsylvania's Private Detective Act of 1953, 22 PA. CONS. STAT. §§ 13, *et seq.* ("PDA"), "[n]o person . . . or corporation, shall engage in the business of private detective . . . or the business of watch, guard or patrol agency, for the purpose of furnishing guards or patrolmen . . . without having first obtained a license to do so." 22 PA. CONS. STAT. § 13(a). "The holder of any license . . . may employ to assist him in his work of private detective . . . and in the conduct of such business as many persons as he may deem necessary." 22 PA. CONS. STAT. § 23(a). Importantly, "[n]o holder of any . . . license . . . shall knowingly employ in connection with his or its business, in any capacity whatsoever, any person who has been convicted of a felony." Id.

While Specialized's C.O.O. possessed a private detective license at all times relevant to this action, Specialized did not.[8] It is well-settled that if a statute unambiguously expresses the legislature's intent, courts must give effect to that intent. Madison v. Res. for Human Dev., Inc., 233 F.3d 175, 185 (3d Cir. 2000); see FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000) (citing Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984)). Pursuant to the language in the PDA, Specialized was required to have a license, inter alia, to engage in the business of private detective services. The PDA explicitly requires a corporation to obtain a license. Nothing in the record suggests that Specialized took the necessary steps to become fully licensed before February 2010.

---

[7] Notably, defendant does not contend that termination of a convicted felon was necessary for compliance with its internal policies.

[8] The record indicates that Specialized is incorporated. (C.S.F., Part I ¶ 2.)

Although defendant was violating the PDA prior to February 2010 by failing to become licensed, the fact remains that plaintiff is a convicted felon. As a convicted felon, plaintiff under the PDA is not qualified to work as a security guard for a private detective business. Because an inference of employment discrimination cannot be drawn where an employer commits an adverse employment action against an individual who is unqualified for the position, plaintiff failed to satisfy the second element of his prima facie case.

The third element requires that plaintiff suffered an adverse employment action. The materially adverse standard separates serious injuries from trivial harms. Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68 (2006). The adverse action must dissuade a reasonable employee from engaging in protected activity. Id. at 68. In this case, plaintiff alleges he was terminated from his position as a security guard because he made an internal complaint for being shorted overtime pay. In Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997), the Court of Appeals for the Third Circuit noted that retaliatory conduct rises to the level of a materially adverse action if the conduct alters the "employee's compensation, terms, conditions or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Id. at 1301. Plaintiff was terminated from his position, which altered his compensation and affected his status as an employee. Termination from employment is materially adverse and a reasonable jury could conclude that termination would deter a reasonable worker from making charges of discrimination. Drwal v. Borough of West View, Pa., 617 F. Supp. 2d 397, 420 (W.D. Pa. 2009).[9]

---

[9] Defendant concedes that termination is an adverse employment action. (Def.'s Mem. at 4.) Defendant, however, argues that because plaintiff based his race discrimination claim on the allegation that a white co-worker received overtime and plaintiff did not, and the record shows that plaintiff was paid for every hour he worked, he could not have suffered an adverse employment action. (Id.) This argument is irrelevant. It is undisputed that plaintiff was terminated and termination clearly satisfies the third element requiring an adverse employment action.

The fourth element requires that an otherwise similarly situated person outside of the protected class received more favorable treatment. In determining whether similarly situated non-members of the protected class were treated more favorably than members of the protected class, the court's focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action. Simpson, 142 F.3d at 646. Similarly situated employees are those who have been subject to the same standards and have engaged in the same conduct without any differentiating circumstances that would distinguish the employer's treatment of them. Terrell v. City of Harrisburg Police Dept., 549 F. Supp. 2d 671, 682 (M.D. Pa. 2008). In order to show that an employee is similarly situated, all the relevant aspects of employment need to be nearly identical. Red v. Potter, 211 F. App'x 82, 84 (3d Cir. 2006).

In the present case, plaintiff, who is African-American, complained of being shorted overtime and was subsequently terminated. A Caucasian co-worker also made an internal complaint for overtime pay, but was paid and retained. Plaintiff, however, fails to address whether the Caucasian co-worker had a criminal record or had ever been subject to disciplinary action with defendant. See Simpson, 142 F.3d at 646. Defendant's stated reason for plaintiff's termination was based on plaintiff's felony conviction. Because there is no evidence of record showing that the Caucasian co-worker had a felony conviction, the two individuals cannot be similarly situated. See Terrell, 549 F. Supp. 2d at 682 (holding that the plaintiffs failed to identify any individual outside of their protected class whom the defendants treated more favorably when the disciplinary infractions differed greatly from the actions committed by the plaintiffs). Plaintiff failed to establish elements two (qualification) and four (similarly situated) of his prima facie case, and, as a result, defendant's motion for summary judgment must be

granted with respect to plaintiff's § 1981 race discrimination claim. Due to this failure, the court need not address the other parts of the burden-shifting framework with respect to this claim.

## II. Count II - FLSA retaliatory discharge claim

The second count of plaintiff's complaint is a claim for retaliatory discharge in violation of the FLSA. The FLSA provides, in pertinent part, that it is unlawful for any person to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or cause to be instituted any proceeding under or related to [the FLSA]." 29 U.S.C. § 215(a)(3). In the instant case, plaintiff alleges that he made an internal complaint with respect to defendant's failure to comply with the FLSA overtime requirements and that he was subsequently discharged by the defendant for making that complaint.

Defendant argues that plaintiff's retaliatory discharge claim must fail for reasons similar to its argument with respect to plaintiff's § 1981 claim. Defendant argues that plaintiff failed to meet his prima facie case for retaliatory discharge. Defendant states that the FLSA does not cover internal complaints, despite this court's holding in another case that an internal complaint is a protected activity for purposes of 29 U.S.C. § 215(a)(3). (Def.'s Mem. at 17.); see Wildi, 659 F. Supp. 2d at 664. Defendant argues that plaintiff failed to establish a causal connection between his termination and his internal complaint. (Id.) Defendant argues that even if plaintiff's prima facie case is met, defendant's reason for termination was legitimate because a licensed security company cannot employ an individual with a felony record under the PDA. (Id. at 21.)

### A. Establishing a prima facie case

For a retaliatory discharge claim under the FLSA, the employee must first establish three elements for a prima facie case: (1) the employee engaged in protected employee activity; (2) an adverse action by the employer occurred either after or contemporaneous with the employee's

protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.  Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007); Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).

**B. Plaintiff's prima facie case**

Under the first element of the prima facie case, an internal complaint is a protected activity for purposes of 29 U.S.C. § 215(a)(3).  Wildi, 659 F. Supp. 2d at 664; Chennisi v. Commc'ns Constr. Group, LLC, No. 04-4826, 2005 WL 387594, at *2 (E.D. Pa. Feb. 17, 2005) (holding otherwise would be contrary to the provision's purpose of preventing fear of economic retaliation and encouraging employees to raise concerns about violations of the FLSA); see Kasten v. Saint-Gobain Performance Plastics Corp., 131 U.S. 1325, 1341 (2011).  "To determine if retaliation plaintiffs sufficiently 'opposed' discrimination, we look to the message being conveyed rather than the means of conveyance."  Moore v. City of Phila., 461 F.3d 331, 343 (3d Cir. 2006).

Defendant asserts that there is a strong argument to be made that an internal complaint does not constitute a protected activity under § 215(a)(3) because the Court of Appeals for the Third Circuit has yet to decide the issue.  (Def.'s Mem. at 16.) Defendant cites to a decision that does not directly address the issue of the FLSA, but only references it as analogous precedent in deciding the issue of the protection of  internal complaints with respect to § 510 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1140 ("ERISA").  Edwards v. A.H. Cornell & Son, Inc., 610 F.3d 217, 224 (3d Cir. 2010).  Although there is a circuit split on the issue that the Court of Appeals for the Third Circuit has not yet joined, the majority of those courts, which have addressed the issue, has held that internal complaints are protected under the FLSA and the Court of Appeals for the Third Circuit has cited the majority approach with

approval in dicta. Id. at 224 n.8; Brock v. Richardson, 812 F.2d 121, 124 (3d Cir. 1987).

Plaintiff satisfied the first element because his complaint of shorted overtime to Loris and

Spangler is considered a protected activity under the FLSA.

The second element of plaintiff's prima facie case requires him to establish that defendant

took a materially adverse action against him. Plaintiff was terminated from his position, which

altered his compensation and affected his status as an employee. Termination from employment

is materially adverse and a reasonable jury could conclude that termination would deter a

reasonable worker from making complaints regarding payment they believe they were shorted.

Plaintiff satisfied the second element.

The third and final requirement for a plaintiff to establish a prima facie case of retaliation

is that a causal connection must exist between the adverse action and the plaintiff's protected

activity. Defendant argues that plaintiff's retaliation claim fails because he cannot demonstrate a

causal connection between the decision to terminate his employment and his protected activity of

making complaints for overtime compensation.

The United States Court of Appeals for the Third Circuit articulated two main factors that

are relevant with respect to establishing a causal link to satisfy a prima facie case of retaliation:

(1) timing or (2) evidence of ongoing antagonism. Abramson v. William Paterson College of

N.J., 260 F.3d 265, 288 (3d Cir. 2001) ("Temporal proximity . . . is sufficient to establish the

causal link. [A] plaintiff can [also] establish a link between his or her protected behavior and

subsequent discharge if the employer engaged in a pattern of antagonism in the intervening

period."). As this court stated in Wildi:

> The United States Court of Appeals for the Third Circuit is
> somewhat ambivalent with respect to whether timing alone is
> sufficient to satisfy the causation prong of the prima facie case.
> See Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir.

20

1997) ("Temporal proximity is sufficient to establish the causal link."); Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989) (causal link established where plaintiff discharged two days following employer's receipt of the plaintiff's EEOC claim); but cf. Quiroga v. Hasbro, Inc., 934 F.2d 497 (3d Cir. 1991) (following bench trial, court determined "as a matter of fact" the timing of the plaintiff's discharge alone did not raise an inference of retaliation); Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (causation prong not established on timing alone where 19 months passed following protected activity and adverse employment action: "Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."). Timing, however, in conjunction with other types of suggestive evidence, is clearly sufficient to demonstrate the causal link. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000). For example, timing combined with evidence of inconsistent reasons given by an employer for an employee's termination was held to satisfy the causation prong of the prima facie case. Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3d Cir. 1986); see Abramson, 260 F.3d at 289 ("Here, as we found in our discussion of the discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in demonstrating that those reasons were vague and inconsistent."); see also EEOC v. L.B. Foster Co., 123 F.3d 746, 753-54 (3d Cir. 1997), cert. denied, 552 U.S. 1147.

Id. at 666.

Plaintiff may rely on a "broad array of evidence" to establish a causal link between his complaints and the materially adverse action. Marra, 497 F.3d at 302. On its own, "an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, to establish the requisite causal connection." Id. (citing Robinson, 120 F.3d at 302). In Jalil, the employee was terminated two days after filing an EEOC claim. Causation was inferred from this narrow time frame because it was unusually suggestive. Jalil, 873 F.2d at 708.

Plaintiff did not present any evidence of ongoing antagonism. There, however, is suggestive evidence that supports the causal link. The inconsistency of keeping plaintiff employed for over four months after defendant knew plaintiff had a criminal record and asserting

he was terminated for having that record, together with the timing, casts sufficient doubt to support the causal connection. Although he could not recall how much time elapsed between his complaint and his subsequent termination, plaintiff likely made his complaint for the shorted overtime pay in or around early to mid June 2008. (See Def.'s App., Tab 13 at A136-43.) Plaintiff was terminated in late July or early August 2008. The degree of suggestiveness of the time span depends on the particular facts of the case. Emerick v. Norfolk Southern Ry. Co., No. 03-266, 2006 WL 3692595, at *13 (W.D. Pa. Dec. 12, 2006). In plaintiff's case, the time span between the internal complaint and the termination was approximately a month and a half to two months. Based upon this short time span and the over four-month delay in firing plaintiff after defendant learned about his criminal record, a reasonable fact-finder could determine that there was a causal link between the protected activity and the adverse action. See Fasold v. Justice, 409 F.3d 178, 189-90 (3d Cir. 2005) (holding than a time span of "less than three months" is temporally proximate and "an inference of retaliation can be drawn"). While it is a close call, the court concludes that the timing and the delay of four months in firing plaintiff after learning he had a criminal record is sufficient evidence of a causal connection between plaintiff's termination and his protected activity to withstand a motion for summary judgment. Plaintiff established a prima facie case for retaliatory discharge under the FLSA sufficient to withstand the motion for summary judgment.

### C. Defendant's legitimate, nondiscriminatory reason for plaintiff's termination

In a retaliatory discharge case under the FLSA, after the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the termination. See McDonnell Douglas, 411 U.S. at 802. The defendant must produce evidence that the plaintiff was rejected, or that someone else was preferred, for reasons that are

legitimate and nondiscriminatory.  Burdine, 450, U.S. at 254.  The Supreme Court has held that this step does not require the employer to disprove a discriminatory motive, but merely to state a "legitimate, nondiscriminatory" motive for its employment action.  Mease v. Wilmington Trust Co., 726 F. Supp. 2d 429, 436 (D. Del. 2010) (citing Bd. of Trustees v. Sweeney, 439 U.S. 24, 26 (1978)).

Defendant's proffered reason for terminating plaintiff was that plaintiff had a prior felony conviction, which precluded defendant from maintaining his employment under the applicable private detective licensing statute.  The fact that defendant holds a mistaken belief about the appropriate interpretation of the statute does not preclude defendant's reasoning from qualifying as legitimate.  In Watson v. Southeastern Pennsylvania Transportation Authority, 207 F.3d 207, 222 (3d Cir. 2000), the Court of Appeals for the Third Circuit explained that an employer is permitted "to take an adverse employment action for a reason that is not 'true' in the sense that it is not objectively correct."  For example:

> [I]f an employer sincerely believes that an employee has stolen company funds and discharges the employee for this reason, the employer should not be held liable under the [employment discrimination statutes in question] just because it turns out that the employee did not steal the funds and that the employer's reason for the discharge was in this sense not "true."

Id.  The inquiry must focus upon "the perception of the decision maker."  Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991).  The defendant need only an honest belief that the incident occurred.  Watson, 207 F.3d at 222.  At this stage, an employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that a nonretaliatory reason for the adverse employment decision existed.  Fuentes, 32 F.3d at 763.  The burden of production is light and defendant does not need to persuade the court that it was actually

motivated by the reason which it offers.  <u>Burdine</u>, 450 U.S. at 254.  The court concludes that defendant met its burden of production.

**D. Proof of pretext**

After the defendant satisfies its burden of production to demonstrate a legitimate and nondiscriminatory business reason for the employment decision, the burden of production shifts back to the plaintiff to show that the "employer's proffered reason [for the employment action' was not the true reason," but was instead mere pretext for the discrimination.  <u>Mease</u>, 726 F. Supp. 2d at 436; <u>see</u> <u>Stewart v. Rutgers</u>, 120 F.3d 426, 432 (3d Cir. 1997).

The plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; *or* (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  <u>Tomasso v. Boeing Co.</u>, 445 F.3d 702, 706 (3d Cir. 2006) (citing <u>Fuentes</u>, 32 F.3d at 764) (emphasis added).  A plaintiff must do more than show that the employer was simply wrong or mistaken.  <u>Tomasso</u>, 445 F.3d at 706.  The two prongs of the <u>Fuentes</u> test are distinct and must be separately analyzed.  <u>Wildi</u>, 659 F. Supp. 2d at 668.

**1. Prong One**

A plaintiff must submit evidence that could cause a reasonable fact-finder to discredit the employer's articulated reason for the adverse employment action in order to overcome summary judgment and bring his case to trial.  To discredit the employer's articulated reason, the plaintiff does not need to produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 732 (3d Cir. 1995), or produce additional evidence beyond his prima facie case.  <u>Fuentes</u>, 32 F.3d at 764.  The

plaintiff must, however, demonstrate such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons." Fuentes, 32 F.3d at 765 (quoting Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)).

The question in prong one of the Fuentes test is not whether the employer made the best, or even a sound, business decision, it is whether the real reason for the adverse result suffered by the plaintiff is discrimination. Keller, 130 F.3d at 1109. Cases analyzed under this prong usually survive a motion for summary judgment when the employer's stated reason for termination is so implausible that a reasonable fact-finder could not believe it. Wildi, 659 F. Supp. 2d at 670. The court is not permitted to set its own standards for the employer or get involved in the employer's subjective business decisions. Ezold v. Wolf Block, Schorr, & Solis-Cohen, 983 F.2d 509, 527 (3d Cir. 1992).

In this case, defendant became aware of plaintiff's felony conviction on or around March 11, 2008, but plaintiff was not terminated until late July or early August 2008. After plaintiff was told that his criminal background check revealed felony convictions, plaintiff was instructed to return to work. Defendant's assertion that plaintiff's felony conviction was the reason for termination, as opposed to some other reason, such as plaintiff's complaint for shorted overtime pay, under these circumstances where he worked for approximately four months after defendant learned about his felony conviction, could be considered so implausible that a reasonable fact-finder could not believe it to be true. Orenge v. Veneman, No. 04-297, 2006 WL 2711651, at *15 (W.D. Pa. Sept. 20, 2006); see Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 330-32 (3d Cir. 1995) (the employer argued the reason for firing the employee was because of his

poor sales performance, while the evidence showed the employee was the leading salesperson in the region). Because defendant satisfied the first prong, the court does not need to address the second prong of the <u>Fuentes</u> test.

### III. Count III - Violation of the RIA

Count three alleges a violation of the RIA, which provides in relevant part, "whenever an employer is in receipt of information which is part of an employment applicant's criminal history record information file, it may use that information for the purpose of deciding whether or not to hire the applicant." 18 PA. CONS. STAT. § 9125(a). With respect to an employer's use of that information, "felony . . . convictions may be considered by the employer only to the extent to which they relate to the applicant's suitability for employment in the position for which he has applied." 18 PA. CONS. STAT. § 9125(b). The RIA is relevant with respect to the hiring, not the termination, of an employee. As such, plaintiff's claims may not fall under the purview of the statute. Assuming, however, that the statute would include termination, plaintiff's claim would still not survive summary judgment.

Defendant asserts that it was required to consider the felony conviction with regard to plaintiff's employment because no licensed detective or security guard agency under the PDA may knowingly employ a convicted felon to provide security services. (Def.'s Mem. at 28.) Defendant maintains that it was not only permitted to terminate plaintiff for his felony record, but it was obligated to do so. (<u>Id.</u>) Plaintiff counters that defendant, at all times relevant to the present action, was unlicensed and therefore its argument that it was prohibited from employing a felon lacks merit. (Pl. Brief (ECF No. 33) at 19-20.) As discussed <u>supra</u>, however, defendant's mistaken belief that it was a fully licensed private detective business at the time of the adverse employment action is irrelevant. Regardless whether or not defendant was licensed, plaintiff was

not qualified for the desired position due to his felony record. The PDA contemplates that a convicted felon cannot be employed by a detective agency to provide security services. The issue, however, is not one of qualification, but whether defendant was permitted to consider plaintiff's felony record with respect to plaintiff's employment.

When an employer denies employment to an individual because of his criminal record, the employer's denial of employment must be reasonably related to the furtherance of a legitimate public objective. Hunter v. Port Authority of Allegheny County, 419 A.2d 631, 638 (Pa. Super. Ct. 1980). "[A]ny felony conviction . . . for a crime of moral turpitude or of violence against any other person(s)," may well serve a legitimate public objective. El v. Southeastern Pennsylvania Transp. Authority, 297 F. Supp. 2d 758, 762 (E.D. Pa. 2003). In some instances, the fact of a prior conviction will be extremely relevant, perhaps even conclusive, of an individual's fitness for a particular job. For example, a bar against the employment of convicted felons as police officers would probably be reasonable since "a person who has committed a felony may be thought to lack the qualities of self-control or honesty that this sensitive job requires." Upshaw v. McNamara, 435 F.2d 1188, 1190 (1st Cir. 1970).

The extent to which the employer's interest in running his business is limited by considerations of public policy must be determined on a case-by-case basis. Yaindl v. Ingersoll-Rand Co. Standard Pump-Aldrich Div., 422 A.2d 611, 617 (Pa. Super. Ct. 1980). A legitimate public objective, i.e., precluding detective agencies from employing convicted felons to provide security services at a third party's premises, underlies the PDA. Pennsylvania bars detective agencies from employing convicted felons to serve as security guards. Security guards are hired to protect others or their property from criminal acts. It is reasonable to conclude that, like police officers, security guards provide sensitive services and convicted felons under the PDA

"may be thought to lack the qualities of self-control or honesty that this sensitive job requires." Upshaw, 435 F.2d at 1190.

In the interest of public safety, defendant was permitted to consider plaintiff's felony conviction with regard to his employment.  See Cisco v. United Parcel Serv., Inc., 476 A.2d 1340, 1344 (Pa. Super. Ct. 1984) (holding that a private employer's discharge of an employee who was accused of theft and trespass was a plausible and legitimate reason for discharge because the employer's business was to enter on the premises of others and deliver parcels which belonged to them).  There is a paucity of case law interpreting the RIA, but if the employee with a criminal record in Cisco was not permitted to enter the premises to deliver packages, it necessarily follows that a felony conviction is a relevant consideration in deciding suitability for employment as a security guard, who has to enter upon the premises of others and protect those premises.  No reasonable jury could render a verdict in favor of plaintiff with respect to this claim.  Summary judgment must be granted with respect to plaintiff's RIA claim.

### Conclusion

After reviewing defendant's motion for summary judgment, and the submissions of the parties, the motion will be granted with respect to the § 1981 claim and the claim for a violation of the RIA, but denied with respect to the remaining claim for retaliatory discharge in violation of the FLSA.

Summary judgment must be granted in favor of defendant with respect to plaintiff's § 1981 claim because, viewing all evidence in plaintiff's favor, as well as drawing all reasonable inferences in his favor, no reasonable jury could conclude that defendant racially discriminated against plaintiff when he was not qualified for the job in question and no other similarly situated individual outside the protected class received more favorable treatment.  Summary judgment

must also be granted in favor of defendant with respect to plaintiff's RIA claim because defendant was permitted to consider plaintiff's felony conviction in determining suitability for employment as a security guard.

After viewing the facts in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, the court concludes with respect to plaintiff's FLSA retaliatory discharge claim against defendant that there are genuine issues of material fact in dispute with respect to that claim. That claim will need to be resolved by a jury. The motion for summary judgment must be denied with respect to that claim. An appropriate order will be entered.

By the court:


s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Date: August 24, 2011